# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of: | )<br>) |
| One black colored Galaxy S II cellular telephone, hereinafter referred to as "Device C." Device C is currently located at the Drug Enforcement Administration, 4725 W. Electric Ave., West Milwaukee, WI | )<br>)<br>)<br>)<br>)<br>)    Case No. 15-914M (NJ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

    See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

    See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, U.S.C., Sections 841(a)(1), 846, and 843(b); and Title 18, U.S.C., Sections 1952 and 2.

The application is based on these facts: See attached affidavit.

_____
*Applicant's signature*

Task Force Officer Matthew Cooper
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: August 6, 2015

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Hon. Nancy Joseph , U.S. Magistrate Judge
*Printed Name and Title*

# AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, **Matthew Cooper**, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am employed as a Detective with the Milwaukee Police Department and have been a law enforcement officer for over 18 years.  I have been a Detective for over 11 years and have been assigned to the Narcotics Division (Narcotics) for over 10 years.  I was previously assigned to the Vice Control Division (Narcotics) as a police officer for over 2 years.  I have been assigned to the High Intensity Drug Trafficking Area (HIDTA) for over 7 years.   I am also a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration (DEA), and have been since October, 2008.  As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

3.      I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. I have had both formal training and

have participated in numerous complex drug trafficking investigations, including ones using wiretaps. More specifically, my training and experience includes the following:

a. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b. I have also relied upon informants to obtain controlled substances from dealers, and have made undercover purchases of controlled substances;

c. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

d. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

e. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

f. I know that drug traffickers often use electronic equipment, wireless and land-line telephones, and pagers to conduct drug trafficking operations;

g. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

h. I have been assigned to court-authorized wiretaps and have been trained to operate the equipment utilized to conduct such operations;

i. I know that drug traffickers often put their telephones in nominee names in order to distance themselves from telephones that are utilized to facilitate drug trafficking; and

j. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials.

2

4. I have participated in numerous complex narcotics investigations which involved the seizure of computers. cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these computers, cellular phones, cameras, and other digital storage devices. In many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.

5. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6. The property to be searched is:

   a. One LG cellular phone assigned IMEI 014153005796603 and Serial Number 412CYEA579660, hereinafter referred to as "Device A." The Device is currently located at the Drug Enforcement Administration, 4725 W. Electric Ave., West Milwaukee, WI;

   b. One black and green Nokia Model RM-977 phone assigned IMEI 353069063037475 contained in a black and red case, hereinafter referred to as "Device B." The Device is currently located at the Drug Enforcement Administration, 4725 W. Electric Ave., West Milwaukee, WI;

   c. One black colored Galaxy S II cellular telephone, hereinafter referred to as "Device C." The Device is currently located at the Drug Enforcement Administration, 4725 W. Electric Ave., West Milwaukee, WI;

3

> d. One multi-colored Samsung cellular, hereinafter referred to as "Device D." The Device is currently located at the Drug Enforcement Administration, 4725 W. Electric Ave., West Milwaukee, WI.

7.     The applied-for warrants would authorize the forensic examination of Devices A through D, hereinafter, also referred to collectively as "the Devices," for the purpose of identifying electronically stored data particularly described in Attachment B.

## SUMMARY AND BACKGROUND OF THE INVESTIGATION

8.     In April 2014 case agents received information from CS-1 concerning the illegal drug trafficking activities of Rayford and David WILLIAMS, two brothers distributing large amounts of heroin as well as small amounts of cocaine and marijuana in the Eastern District of Wisconsin. During the investigation, case agents determined that Rayford WILLIAMS and David WILLIAMS operated a large-scale drug trafficking organization ("DTO") based in Milwaukee, Wisconsin.

9.     Case agents utilized numerous other investigative techniques as the investigation progressed, including but not limited to: interviews with confidential sources and sources of information; information from other law enforcement officers; documentary evidence; pen register, trap and trace, and telephone toll data; controlled buys of drugs, controlled meetings with targets, recorded telephone calls with targets, and controlled payments of money; physical surveillance, and court-authorized monitoring of several cellular telephones used by DTO members to facilitate their drug trafficking activities with each other and their associates.

10.     As part of the investigation, a cooperating source began to make controlled buys of heroin from Rayford WILLIAMS and David WILLIAMS. As the investigation progressed, case agents learned that David WILLIAMS had been arrested for Operating While Intoxicated in

4

November 2014, and has been in custody since that time. Rayford WILLIAMS, however, continued to distribute heroin. The cooperating source made numerous additional controlled buys of heroin from Rayford WILLIAMS and others.

11.     As part of the investigation, the Honorable Rudolph T. Randa, United States District Court Judge for the Eastern District of Wisconsin, issued Orders authorizing the interception of telephone conversations to and from cellular telephones used by Rayford WILLIAMS and others.

12.     In sum, the investigation revealed that Rayford WILLIAMS obtained heroin from Chicago heroin distributors Mark HAYNIE and William PHILLIPS. PHILLIPS, in turn, obtained the heroin from his sister, Margaree CAMPBELL. Rayford WILLIAMS, often accompanied by Brenda NORTH, transported the heroin from Chicago, Illinois to Milwaukee, Wisconsin for distribution. Rayford WILLIAMS then distributed the heroin to mid-level distributors of the WILLIAMS DTO. Rayford WILLIAMS also distributed street-level quantities of heroin to numerous subjects who arranged heroin transactions for others.

## PROBABLE CAUSE

13.     Over the course of this investigation, CS-1 conducted nineteen controlled buys of heroin from Rayford WILLIAMS, David WILLIAMS, and other DTO members. Prior to each of the controlled buys, case agents searched CS-1 for any drugs, money, weapons, or other contraband. If any money was located, the amount was documented. CS-1 typically made consensually recorded calls to the targets that were monitored by case agents. In each instance, CS-1 identified the person CS-1 had spoken to by name. Case agents also verified the voice of the target once it became familiar to case agents. During each controlled buy, case agents viewed CS-1's phone to determine the number CS-1 called to arrange the transaction or verified

5

the number through telephone records. Prior to each controlled buy, CS-1 was provided with an amount of pre-recorded buy money as well as digital audio and/or video recording devices. Physical surveillance was then conducted of each controlled buy. Following the transactions, CS-1 met with case agents and immediately turned over the suspected heroin. Case agents again searched CS-1 for any drugs, money, weapons, or other contraband. If any money was located, the amount was again documented. CS-1 then related the circumstances of the transaction to case agents. Over the course of this investigation, CS-1 was paid following each transaction. The total cost of the heroin purchased during the controlled buys was $23,050. The total weight of the heroin purchased was 252.1 grams in the original packaging material.

14.     On April 30, 2014, United States Magistrate Judge Nancy Joseph signed a tracking warrant authorizing the installation of a tracking device on the Saturn Ion (Subject Vehicle B). On May 9, 2014, case agents installed a GPS tracking device on the Saturn Ion. Later that day, the device was found destroyed in a roadway. A replacement device was installed on May 12, 2014. Warrants authorizing the continued tracking of the Saturn Ion were signed by the Honorable Patricia Gorence on June 13, 2014; the Honorable Nancy Joseph on July 25, 2014; the Honorable William E. Callahan, Jr. on September 5, 2014; and, the Honorable Nancy Joseph on October 17, 2014, December 1, 2014, January 14, 2015, February 26, 2015, and April 8, 2015.

15.     On January 16, 2015, the Honorable Rudolph T. Randa, United States Judge, Eastern District of Wisconsin, signed an Order authorizing the interception of wire and electronic communications over the cellular telephone assigned telephone number (414) 544-9757, **Target Telephone #1**. The investigation had revealed that this telephone was utilized by Rayford WILLIAMS. On January 28, 2015, Judge Randa also signed an amended Order authorizing the

6

above. During the court authorized monitoring of these communications between January 16, 2015, and February 12, 2015, over 463 intercepted telephone calls and text messages to or from **Target Telephone #1** were deemed pertinent and criminal in nature. These intercepted communications confirmed that Rayford WILLIAMS obtained heroin from William PHILLIPS, a source of supply in Chicago, Illinois. WILLIAMS transported that heroin back to Milwaukee where it was distributed to mid-level distributors as well as street-level users and resellers. The interceptions authorized by the Order ended on February 12, 2015.

16.     On February 12, 2015, the Honorable Rudolph T. Randa, United States Judge, Eastern District of Wisconsin, signed an Order authorizing the continued interception of wire and electronic communications over the cellular telephone assigned telephone number (414) 544-9757, **Target Telephone #1**, and the initial interception of wire and electronic communications to and from the cellular telephone assigned telephone number (773) 800-6808, **Target Telephone #2**, used by William PHILLIPS. During the court authorized monitoring of these communications between February 12, 2015, and March 13, 2015, over 295 intercepted telephone calls and text messages to or from **Target Telephone #1** and over 690 intercepted call and text messages to and from **Target Telephone #2** were deemed pertinent and criminal in nature. Intercepted calls and text messages also confirmed that Mark HAYNIE was an additional Chicago-based heroin source of supply to Rayford WILLIAMS and the WILLIAMS DTO. The intercepted communications to and from **Target Telephone #2** revealed that PHILLIPS was a heroin, cocaine, and prescription pill distributor in the Chicago area. The investigation also confirmed that PHILLIPS was supplied heroin by his sister, Margaree CAMPBELL. Additionally, the heroin PHILLIPS sold to Rayford WILLIAMS was supplied to PHILLIPS by CAMPBELL. That heroin was then transported back to Milwaukee for

7

distribution in the Eastern District of Wisconsin. The interception authorized by this Order as to **Target Telephone #2** ended at 11:59 p.m. on March 13, 2015. The interceptions authorized by the Order as to **Target Telephone #1** were continued on March 13, 2015.

17. On March 13, 2015, the Honorable Rudolph T. Randa, United States Judge, Eastern District of Wisconsin, signed an Order authorizing the continued interception of wire and electronic communications over the cellular telephone assigned telephone number (414) 544-9757, **Target Telephone #1**, and the initial interception of wire and electronic communications over the cellular telephone assigned telephone number (414) 249-1315, **Target Telephone #3**, used by Rayford WILLIAMS, and the cellular telephone assigned telephone number (773) 317-2879, **Target Telephone #4**, used by Margaree CAMPBELL. During the court authorized monitoring of these communications between March 13, 2015, and April 9, 2015, over 435 intercepted telephone calls and text messages to or from **Target Telephone #1** were deemed pertinent and criminal in nature. During the court authorized monitoring of these communications between March 13, 2015, and April 11, 2015, over 206 intercepted call and text messages to and from **Target Telephone #4** were deemed pertinent and criminal in nature. The service to **Target Telephone #3** was suspended just after the authorization was obtained. No pertinent calls were intercepted to or from **Target Telephone #3**. The intercepted communications over **Target Telephone #1** revealed that Rayford WILLIAMS had taken on more of a managerial role in the DTO and was directing others to deliver heroin rather than delivering it himself. Rayford WILLIAMS began utilizing George SEALS as his primary distributor of heroin in the Milwaukee area. The intercepted communications to and from **Target Telephone #4** confirmed that CAMPBELL was a heroin distributor in Chicago, Illinois. CAMPBELL provided distribution quantities of heroin to William PHILLIPS and others. She

8

also distributed street-level quantities of heroin to several subjects. The interception authorized by the Order as to **Target Telephone #4** ended at 11:59 p.m. on April 11, 2015. The interceptions authorized by the Order as to **Target Telephone #1** were continued on April 9, 2015.

18.    On April 9, 2015, the Honorable Rudolph T. Randa, United States Judge, Eastern District of Wisconsin, signed an Order authorizing the continued interception of wire and electronic communications over the cellular telephone assigned telephone number (414) 544-9757, **Target Telephone #1**, and the initial interception of wire and electronic communications over the cellular telephone assigned telephone number (773) 418-9500, **Target Telephone #5**, used by George SEALS. During the court authorized monitoring of these communications between April 9, 2015, and May 4, 2015, over 428 intercepted telephone calls and text messages to or from **Target Telephone #1** and over 558 intercepted call and text messages to and from **Target Telephone #5** were deemed pertinent and criminal in nature. The intercepted communications to and from **Target Telephones #1** and **#5** confirmed that George SEALS was the primary heroin distributor for the WILLIAMS DTO in the Milwaukee area. Rayford WILLIAMS obtained the heroin from PHILLIPS and HAYNIE and provided it to SEALS for distribution. Rayford WILLIAMS also continued supplying heroin to others when he preferred to deal with the customers himself or when SEALS was unavailable.

19.    On May 6, 2015, the Honorable Rudolph T. Randa, United States Judge, Eastern District of Wisconsin, signed an Order authorizing the continued interception of wire and electronic communications over the cellular telephone assigned telephone number (414) 544-9757, **Target Telephone #1**, and over the cellular telephone assigned telephone number (773) 418-9500, **Target Telephone #5**, used by George SEALS. During the court authorized

9

monitoring of these communications between May 6, 2015, and May 12, 2015, 40 intercepted telephone calls and text messages to or from **Target Telephone #1** and over 95 intercepted calls and text messages to and from **Target Telephone #5** were deemed pertinent and criminal in nature. The intercepted communications to and from **Target Telephones #1** and **#5** confirmed that George SEALS continued to be the primary heroin distributor for the WILLIAMS DTO in the Milwaukee area. Rayford WILLIAMS obtained the heroin from PHILLIPS and HAYNIE and provided it to SEALS for distribution. Rayford WILLIAMS also continued supplying heroin to others when he preferred to deal with the customers himself or when SEALS was unavailable.

20. As detailed in the following paragraphs, the investigation to date revealed that Rayford WILLIAMS was supplied heroin by multiple sources, including Mark HAYNIE. Based on telephone toll records and court-authorized intercepted communications, case agents identified Mark HAYNIE as a heroin source of supply to the WILLIAMS DTO. During 2014, case agents identified a pattern of telephone calls and text messages that occurred before, during, and after Rayford WILLIAMS made trips to Chicago when Rayford WILLIAMS is believed to have picked up heroin. This calling pattern led case agents to believe (618) 303-9371 was used by Rayford WILLIAMS' heroin source of supply. On August 7, 2014, case agents conducted surveillance of a meeting between Rayford WILLIAMS and the user of (618) 303-9371 during which case agents believe Rayford WILLIAMS picked up heroin. This transaction occurred inside a black Cadillac CTS, bearing Illinois temporary license plate 595R923, registered to Mark HAYNIE at 536 Lawler, Chicago, Illinois 60644. On August 19, 2014, case agents

10

conducted court-authorized electronic and physical surveillance and identified Mark HAYNIE as the user of (618) 303-9371.[1]

21.     On March 7, 2015, data from the GPS tracking device installed on Rayford WILLIAMS' Saturn Ion indicated the vehicle entered Interstate 94 and began driving toward Chicago, Illinois.  At 12:47 p.m. on March 7, 2015, Rayford WILLIAMS, using **Target Telephone #1**, called HAYNIE at (618) 204-3445.[2]  HAYNIE answered the phone.  HAYNIE asked Rayford WILLIAMS if he was "up here," meaning in Chicago.  Rayford WILLIAMS said he was.  HAYNIE asked, "You finna try to play the lottery?"  Rayford WILLIAMS replied, "Yep."  HAYNIE asked, "What lottery numbers are you trying to play?"  Rayford WILLIAMS replied, "Thirty."  HAYNIE asked, "Oh.  Zero Three O.  Alright."  HAYNIE said he had to move some furniture and would call Rayford WILLIAMS back.  Rayford WILLIAMS asked how long it would be because he was "waiting on my other "partner" (supplier) to hit me back to see can he do something 'cause he ain't even down here."  HAYNIE told Rayford WILLIAMS to give him 1½ hours and he would meet Rayford WILLIAMS.  Rayford WILLIAMS agreed.  Case agents believe Rayford WILLIAMS called HAYNIE to purchase heroin.  HAYNIE asked how much heroin Rayford WILLIAMS wanted (What's the lottery number?").  Rayford WILLIAMS replied that he wanted "30."  Case agents were unable to determine how much heroin Rayford

---

[1] On August 18, 2014, the Honorable Rebecca R. Pallmeyer, Acting Chief Judge for the Northern District of Illinois, signed a warrant and order authorizing the use of electronic investigative techniques to ascertain the physical location of the AT&T cellular telephone assigned phone number (618) 303-9371.

[2] Agents found that HAYNIE started using this phone approximately January 27, 2015.  A common call analysis showed many of the same numbers in contact with HAYNIE's old phone number.  HAYNIE's use of this phone was later corroborated through visual surveillance.  An administrative subpoena served on Sprint revealed (618) 204-3445 is subscribed to "Samsung Galaxy S2."

11

WILLIAMS picked up, but believe it may have been 30 grams. HAYNIE told Rayford WILLIAMS he would meet him in about 1 ½ hours to deliver the heroin.

22.     On March 7, 2015, **Target Telephone #1** received three incoming calls from (618) 204-3445 at 2:01 p.m., and another incoming call at 2:34 p.m. All of these calls went to voicemail. No message was left. At 2:34 p.m., HAYNIE, using (618) 204-3445, called Rayford WILLIAMS at **Target Telephone #1**. HAYNIE told Rayford WILLIAMS he had been trying to call Rayford WILLIAMS. Rayford WILLIAMS said he saw the calls and that's why he called HAYNIE back. Rayford WILLIAMS told HAYNIE he was near Madison and Lockwood, and was going to his daughter's house on Adams and Lockwood. HAYNIE said he would meet Rayford WILLIAMS at that location. Rayford WILLIAMS provided HAYNIE with directions to his daughter's house in the area of W. Adams street and S. Lockwood Avenue. Rayford WILLIAMS told HAYNIE he would wait outside. HAYNIE agreed. Case agents believe HAYNIE called Rayford WILLIAMS because HAYNIE was ready to deliver the heroin to him. Rayford WILLIAMS told HAYNIE the location where he wanted HAYNIE to meet him.

23.     Later on March 7, 2015, **Target Telephone #1** received incoming calls from HAYNIE, using (618) 204-3445, at 2:46 p.m., 2:46 p.m., 2:46 p.m., 2:51 p.m., 2:51 p.m., and 2:51 p.m. All of these calls went to voicemail. No message was left. At 2:53 p.m., Rayford WILLIAMS, using **Target Telephone #1**, called HAYNIE at (618) 204-3445. Rayford WILLIAMS told HAYNIE he had left his phone in the car. Rayford WILLIAMS again provided HAYNIE directions to his daughter's residence. HAYNIE said he was driving through an alley and then would go down the one-way on Lockwood. Rayford WILLIAMS told HAYNIE, "On Lockwood? No, don't come down the one-way." HAYNIE asked, "Why you say that?" Rayford WILLIAMS replied, "You gotta do things legit, you know. You know they got cameras

12

and shit on these fuckin' blocks." HAYNIE agreed then asked Rayford WILLIAMS if he was

wearing a "Cali" jacket. Rayford WILLIAMS said he was and told HAYNIE, "Red." HAYNIE

stated, "Yeah. I see you. Here I come." Case agents believe HAYNIE had a hard time locating

Rayford WILLIAMS' daughter's residence. Rayford WILLIAMS told HAYNIE not to drive

down the one-way street the wrong way, because he had to obey the laws ("do things legit")

when conducting a drug transaction so as not to raise the suspicions of police. Eventually he

located Rayford WILLIAMS.

24.     At the time of this call, Chicago Police Department Officer Homero Ramirez

observed a black 2006 Cadillac CTS, bearing Illinois license plate DAIZ618, travelling north on

S. Lockwood Avenue at a high rate of speed. The license plate number lists to Mark HAYNIE

and Sydney McBurney at 536 Lawler Ave., Chicago, IL 60644. Case agents have previously

observed Mark HAYNIE driving this vehicle. South Lockwood Avenue is a one-way street

where traffic is designated to travel south. At 2:56 p.m., the vehicle then turned west on W.

Adams Street, and parked behind Rayford WILLIAMS' Saturn Ion. Officer Ramirez observed

Rayford WILLIAMS walk from the direction of 5341 W. Adams Street toward the Cadillac.

Rayford WILLIAMS was wearing a red jacket and dark pants. The driver exited the Cadillac

and met Rayford WILLIAMS in the middle of the street. Officer Ramirez described the driver

of the Cadillac as a black male, shorter than Rayford WILLIAMS, wearing a green leather

jacket. Officer Ramirez was unable to get a good look at this male's face. Rayford WILLIAMS

and the male (believed to be HAYNIE) spoke in the middle of the street for 10-15 seconds.

Rayford WILLIAMS then entered the driver's seat of the Saturn and the other male entered the

front passenger seat of the Saturn. The Saturn then drove west on W. Adams Street out of the

area. The Saturn was not followed. Surveillance was then terminated. Case agents believe

Rayford WILLIAMS and HAYNIE met outside Rayford WILLIAMS' daughter's residence. Rayford WILLIAMS and HAYNIE then entered the Saturn and drove away from the area to either conduct the heroin transaction or to pick up the heroin from HAYNIE's heroin supplier. The data from the GPS device on the Saturn Ion revealed the Saturn travelled to several locations in Chicago before returning to the 5300 block of W. Adams Street at 3:34 p.m. The data from the GPS device revealed that the Saturn Ion re-entered Interstate 290 at 6:05 p.m. and arrived in Milwaukee at 7:38 p.m. The vehicle arrived at Rayford WILLIAMS' residence, 4328 N. 88th St., at 7:57 p.m.

25. On March 8, 2015, at 4:08 p.m., Rayford WILLIAMS, using **Target Telephone #1**, called HAYNIE back at (618) 204-3445. HAYNIE asked, "Why you didn't call me or text me to let me know you made it back yesterday?" Rayford WILLIAMS replied, "I forgot. I had to take care of business." Rayford WILLIAMS said he meant to call HAYNIE back today. HAYNIE replied, "I just wanted to make sure you made it." Rayford WILLIAMS said, "Oh, yeah. I'm cool." HAYNIE told Rayford WILLIAMS to be safe and then said, "Hit me when you need me." Rayford WILLIAMS agreed. Case agents are aware, based on intercepted calls and text messages over **Target Telephone #1**, that Rayford WILLIAMS always calls or sends a text message to his heroin suppliers upon returning to Milwaukee to let the suppliers know he arrived safely. Case agents believe HAYNIE checked on Rayford WILLIAMS' well-being after Rayford WILLIAMS did not call or send a text message to HAYNIE. Rayford WILLIAMS told HAYNIE he was safe ("I'm cool.").

26. On April 22, 2015, at 4:57 p.m., Rayford WILLIAMS, using **Target Telephone #1**, called HAYNIE at (618) 204-3445. Rayford WILLIAMS told HAYNIE he was in the Chicago area. HAYNIE asked, "What you on?" Rayford WILLIAMS replied, "You already

14

know." HAYNIE asked, "What you trying to do?" The call was then disconnected. Case agents

believe Rayford WILLIAMS told HAYNIE he was in Chicago. HAYNIE asked what Rayford

WILLIAMS was doing there. Rayford WILLIAMS told HAYNIE he was there to purchase

heroin ("you already know"). HAYNIE asked Rayford WILLIAMS how much heroin Rayford

WILLIAMS was trying to purchase ("What you trying to do?"). The call was then disconnected.

At 4:58 p.m., Rayford WILLIAMS, using **Target Telephone #1**, called HAYNIE back at (618)

204-3445. HAYNIE asked, "What you trying to do?" Rayford WILLIAMS replied, "25."

HAYNIE told Rayford WILLIAMS he would call his source and see if the source could meet

HAYNIE. HAYNIE would then meet Rayford WILLIAMS. HAYNIE told Rayford

WILLIAMS he would call him back in 30 minutes. Rayford WILLIAMS agreed.

  27. At 5:02 p.m., HAYNIE, using (618) 204-3445, called Rayford WILLIAMS at

**Target Telephone #1**. HAYNIE and Rayford WILLIAMS discussed which heroin supplier

HAYNIE was going to call to get the heroin. Rayford WILLIAMS asked, "It ain't that blue

stuff, is it?" HAYNIE replied, "No. It was 'grinate' from him…His was on deck." Rayford

WILLIAMS said, "Okay." HAYNIE said he would call the source to find out where to meet and

call Rayford WILLIAMS back. Rayford WILLIAMS agreed. Case agents believe Rayford

WILLIAMS asked if the heroin was "the blue stuff" that they had received during a prior

transaction. Rayford WILLIAMS wanted to make sure that wasn't the heroin HAYNIE was

going to obtain. HAYNIE told Rayford WILLIAMS the source's heroin was the gray ("grinate")

heroin, which is known to be high quality heroin. HAYNIE said the source's heroin was high

quality ("His was on deck"). Rayford WILLIAMS agreed. HAYNIE told Rayford WILLIAMS

he would call Rayford WILLIAMS back and tell Rayford WILLIAMS where to meet. At 5:34

p.m., HAYNIE, using (618) 204-3445, called Rayford WILLIAMS at **Target Telephone #1**.

HAYNIE told Rayford WILLIAMS he had just spoken to the heroin source. HAYNIE said, "He finna give me the 'semp' for you and the whatchacall what you said you wanted to play." The call was then disconnected. Case agents believe HAYNIE told Rayford WILLIAMS the heroin source was going to give HAYNIE a sample ("semp") of heroin to give Rayford WILLIAMS as well as the 25 grams Rayford WILLIAMS had asked for ("the whatchacall what you said you wanted to play). At 6:30 p.m., Rayford WILLIAMS, using **Target Telephone #1**, called HAYNIE at (618) 204-3445. Rayford WILLIAMS asked HAYNIE if the source had arrived. HAYNIE stated, "Yeah, he dropped that move off." Case agents believe HAYNIE told Rayford WILLIAMS the source had already dropped the heroin off to HAYNIE. HAYNIE then provided directions to his residence at 7412 W. 63rd Place, Summit, Illinois. The GPS tracking device on Rayford WILLIAMS' Saturn Ion indicated that the vehicle arrived at HAYNIE's residence at about 7:04 p.m. and left at about 7:18 p.m. The court-authorized positional information for (618) 204-3445 revealed that the phone was in close proximity to HAYNIE's residence during that time. The vehicle left Chicago at about 7:55 p.m. At 9:31 p.m., Rayford WILLIAMS, using **Target Telephone #1**, called HAYNIE at (618) 204-3445. HAYNIE asked Rayford WILLIAMS, "You made it home?" Rayford WILLIAMS replied, "Yeah." Case agents are aware that Rayford WILLIAMS always lets HAYNIE know he returned safely to Milwaukee after picking up heroin and believe that was the purpose of this call. The GPS tracking device indicated the vehicle arrived back in Milwaukee at about 9:48 p.m. Case agents are aware, based on subsequent intercepted calls, that Rayford WILLIAMS picked up heroin from HAYNIE and transported it back to Milwaukee for distribution.

28.     On May 11, 2015, the Honorable Nancy Joseph issued arrest warrants for Rayford WILLIAMS, Mark HAYNIE, and 21 other individuals charging that they violated Title 21,

16

United States Code Sections 841(a)(1), 846, and 843(b), Distribution of, and Possession with Intent to Distribute, Controlled Substances; Attempt and Conspiracy to commit violations of Controlled Substances Offenses, including to Distribute and Possess with Intent to Distribute Controlled Substances; Use of Communications Facilities to Facilitate Controlled Substance Felonies; and Title 18, United States Code Section 1952, Interstate Travel In Aid of Racketeering Enterprises, and Title 18, United States Code Section 2.

29.     On May 12, 2015, at approximately 3:44 a.m., case agents observed WILLIAMS walk from his residence and enter the driver's seat of the Saturn Ion. A short time later, WILLIAMS drove the Saturn away from the area. Case agents followed the Saturn west on W. Marion Street and then north on N. 92nd Street. North 92nd Street turns into N. Swan Blvd. and then N. 91st Street. At approximately 7500 N. 91st Street, case agents directed Wisconsin State Patrol Troopers Hunter and Lohman to conduct a traffic stop of the Saturn. The vehicle stopped and WILLIAMS was taken into custody. A search incident to arrest of WILLIAMS revealed an LG cellular phone assigned IMEI 014153005796603 and Serial Number 412CYEA579660 (Device A); and a plastic bag containing a black and green Nokia Model RM-977 phone assigned IMEI 353069063037475 (Device B) contained in a black and red case. Telephone records from AT&T revealed that **Target Telephone #1** is assigned IMEI 353069063037475. This IMEI confirmed that Device B is Target Telephone #1.

30.     Also on May 12, 2015, at approximately 6:00 a.m., case agents located Mark HAYNIE at his residence, 7412 W. 63rd Pl., Summit, Illinois, and took him into custody. During a consensual search of the residenc, case agents located one black colored Galaxy S II cellular telephone (Device C); and one multi-colored Samsung cellular telephone (Device D). Seizing agents identified the phone number of Device C as (618) 204-6850. Telephone records from

17

Sprint revealed that (618) 204-3448, the number used by HAYNIE, is assigned to a telephone which is assigned Mobile Station Identification Number (MSID) (618) 204-6850. Case agents believe that seizing agents incorrectly obtained the MSID for Device C rather than the telephone number and that Device C is actually assigned phone number (618) 204-3448, the number used by HAYNIE. Seizing agents identified the telephone number for Device D as (314) 255-7372. Case agents are aware this number is subscribed to Sydney McBurney, the girlfriend of HAYNIE. Case agents are aware that HAYNIE has used several telephones during the course of this investigation and WILLIAMS has tried to call HAYNIE at several different telephone numbers, including numbers subscribed to McBurney.

31.     Devices A thru D are currently in the lawful possession of the Drug Enforcement Administration. As described above, Devices A through D came into the Drug Enforcement Administrations's possession following the arrests of Rayford WILLIAMS and Mark HAYNIE on May 12, 2015. In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the Drug Enforcement Administration.

## TECHNICAL TERMS

32.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.   Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and

from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected

19

to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

33. Based on my training, experience, and research, I know that Devices A thru D have the capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA and all have the ability to access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

20

35.   *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

36.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of Devices A thru D consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose

many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

37. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

38. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

## ATTACHMENT A

The property to be searched is:

    a.   One LG cellular phone assigned IMEI 014153005796603 and Serial Number 412CYEA579660, hereinafter referred to as "Device A." The Device is currently located at the Drug Enforcement Administration, 4725 W. Electric Ave., West Milwaukee, WI;

    b.   One black and green Nokia Model RM-977 phone assigned IMEI 353069063037475 contained in a black and red case, hereinafter referred to as "Device B." The Device is currently located at the Drug Enforcement Administration, 4725 W. Electric Ave., West Milwaukee, WI;

    c.   One black colored Galaxy S II cellular telephone, hereinafter referred to as "Device C." The Device is currently located at the Drug Enforcement Administration, 4725 W. Electric Ave., West Milwaukee, WI; and

    d.   One multi-colored Samsung cellular, hereinafter referred to as "Device D." The Device is currently located at the Drug Enforcement Administration, 4725 W. Electric Ave., West Milwaukee, WI.

This warrant authorizes the forensic examination of Devices A through D for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.       All records on Devices A through D described in Attachment A that relate to violations of Title 21, United States Code, Sections 841, 846 and 843 (b); and, Title 18, United States Code, Sections 1952 and 2, and involve Rayford WILLIAMS, Mark HAYNIE, and others since April 1, 2014 through May 12, 2015, including:

     a. lists of customers and related identifying information;

     b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

     c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

     d. any information recording Rayford WILLIAMS' or Mark HAYNIE's schedule or travel from April 1, 2014 to May 12, 2015; and,

     e. all bank records, checks, credit card bills, account information, and other financial records.

2.       Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.       As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.